McDonough v. Garcia Good morning. May it please the court, counsel. My name is Alan Greenstein. I represent Dr. McDonough v. Garcia. I'm here to report on the court's decision to grant the appellee's motion for summary judgment. In the case of the city of Homestead, which was brought before the court on July 1 of 2016, we believe we have shown that the city of Homestead and its officers violated my client's rights under the fourth and first amendments and under Florida state law. The lower court erred in granting the appellee's motion for summary judgment. The court should have granted our motion for summary judgment, as I think, as a matter of law, we're entitled to that decision. There are three areas in this case. One, the arrest for disorderly conduct. Two, the arrest for cyberstalking. And three, the First Amendment issues. Now, excuse me, since the court asked us to address an issue dealing with the First Amendment, I think I should deal with that initially. The court asked the question about whether or not the exclusion based upon comments he may have made to counsel Maldonado were content neutral or content based. So let me answer the question this way, if I can. The argument, an argument could be made that his exclusion on July 27th, both being stopped and being taken out of the chambers were content based. However, I think the exclusion that was made by the trespass order, both by the city and at that time, Sergeant Wright were, they were not worried about what he was going to say. They just didn't want him saying anything. And therefore, they excluded him and banned him for an indeterminate period of time so that he could not come back and address the city council, which he had done on many times before. So is your point then that the trespass order was not so much a punishment for what he had said in the past that that might have been a content based judgment, but on a going forward basis, they just didn't want him around because he was disruptive. And that was a content neutral. Yes, that that appears to be what the evidence shows. I wish I could show you something else. But the evidence seems to indicate that when Sergeant Wright spoke to him, when he came back on the 24th, he said, based on your comments and behavior. And I don't think I have any evidence to show the court that in the discussions that the city council, I'm sorry, the city manager and the chief of police had, it was based upon his comments about Councilman Maldonado. I mean, maybe we'll have to ask your adversary about this, because it's their brief that teased up this question. They say that the trespass order was based on some mix of things, some of which seem to go to content, cursing the perceived threat to Maldonado, one of which disruptive behavior or whatever it is, seems to go to something that I would call content neutral. Right. I guess I'm not quite sure whether that is sort of retroactive or prospective. Is that a punishment for what he's done, what he did before or prospective sort of like prophylactic? I'd like to say it was it was punishment for what he did before in terms of when he yelled and screamed when he was when he yelled when he was taken out of the chambers. I can't tell the court. I wish I could that it was based upon his comments about Councilman Maldonado, because I don't have any evidence of what happened inside the council chambers to be inside the office. I'm sorry, the city manager, as a matter of fact, when we took the deposition of chief role, he had no recollection of even doing this. So we had to piece together what happened based upon other depositions that have been taken in other cases. And is it more like a is it more like a time, place and manner restriction? Or if it was based on disruptiveness, is it not even speech related? Is it something else? It's well, it is speech related in that they were not allowing to come back and speak. The district court said this was content neutral. All the cases that I've listed and given the court were based on content neutral. I wish I could tell you it was based upon what he said to Councilman Maldonado, honestly, but I have no evidence of that. The evidence is that they had a meeting. Chief role said we're not letting this guy back in trespass him. So our position is, even if it's content neutral, they did not have the right to ban him because it is not narrowly tailored to achieve the government's purpose, which was to prevent him from bad behavior. What would what would be narrowly tailored? Let's say we want to make it your client. Right. So you're not giving up anything for him. But let's say that someone else is just extremely disruptive repeatedly every time, maybe cursing, saying maybe maybe perhaps they're mentally ill. Right. They're not even kind of engaging with what the subject matter is. What would be a narrowly tailored way to deal with that? I expected the court to ask me that question. First of all, let me say, if the court reads the Walsh case, which I gave the court in that case, basically, the judge said every single time you take him out, you can't prohibit someone from speaking. Now, interestingly, back in 2016, I don't know that they have the tools then that we may have now, where Zoom has become certainly. For example, judge the court. I'm sorry. The city council could say you can't come in. We'll allow you to address the council chamber on Zoom. That way you have the audience. You can hear everything that's being said. Should you be disruptive? We will turn you off. But that might be one back in 2016. They could advise that person. If you're disruptive, we are going to exclude you. Now, let me say this. That's not what happened in this case. I understand the court's question. And prospectively, this court doesn't have to decide what should happen to someone should he or she be constantly disruptive. The record evidence shows that my client spoke many numerous times before and had never been disruptive. So basically what I know that I'm sorry to interrupt you, but I know that you neither you nor the other side use the term prior restraint. Do you think that this was a prior restraint? I thought I did use the word prior restraint. If I didn't, yes, it is a prior restraint. They are stopping him from speaking before he is allowed to say anything. And they're not allowed to do that unless it serves some governmental purpose. And they can restrict time, place, and manner. Which, what in essence the city decided to do was use the ultimate punishment to my client, ban him from speaking. Can I ask you just a quick question? Sure. I mean, it wasn't really a ban, right? I mean, they just said write us a letter. Did he ever try? No. Did he ever write the letter? No, sir. Why? First of all, they didn't tell him who to write the letter to. And if I can say something about that, Judge, the lower court, the district court, said one of the reasons I'm going to find that this is narrowly tailored is because they gave him a procedure, which is write a letter. Sergeant Wright never told him who to write the letter to, what would happen with the letter. And as a matter of fact, the district court cites Katrone for the idea that you have to give somebody a procedure. The procedure in Katrone, which they actually gave somebody a piece of paper, had no further procedure. And this court ruled that that was not an appropriate procedure. There's no way for anybody to know what to do. Additionally, the city council had decided four months earlier that they were going to change the rules of decorum so that no one would be banned anymore. But before April of 2016, they had a provision that the mayor could ban someone if they were disruptive. And they had a procedure as to how you could write the letter. You've got to get the city council to agree to let you come back. They changed that and got rid of that decorum policy in April of 2016, four months before my client spoke in front of the city council. So there was no procedure. Sergeant Wright made it up. There was no way for him to know who to write the letter to. When you write a letter to the city council, wouldn't that be? Maybe, maybe not. But since the city council didn't have a procedure as to what to do, there was no point in him writing a letter. Did he have any obligation at all to sort of inquire about, like, okay, I'd like to come back. To whom should this letter be written? What should it say? Did he have any obligation at all to kind of engage in the? No, I don't think he did. He asked, which was more than he probably had to do. They should have provided him an opportunity. In other words, the city should have said, we're banning you. Here is how you can come back. The obligation shouldn't be on the banned person to say, well, wait a second. How do I come back? What am I supposed to do? The obligation should be on the government. They're the ones saying you can't come back. As I understand your case, you're not challenging the constitutionality of the trespass procedure itself, right? No. You're just challenging its application in this situation. And the result that occurred from it, which was. While he was under a valid trespass order, did he even have a First Amendment right to appear at the meeting? I don't think it was a valid trespass order. Then maybe I am challenging it based upon the way you're asking it. It wasn't a valid trespass order because it violated the First Amendment law on content neutral meetings by a city council meeting, which must provide someone. They have to be narrowly tailored. How can the ultimate punishment be narrowly tailored? And second, they have to give him an ample alternative channels of communication, which they did not. There was no way for him to address the city council with the audience, just like in Walsh and in Brown versus Jacksonville, which is I cited. And what I said in my briefs is this court is obviously not bound by those cases. They're district court cases. Walsh was from Oregon. But they're the only cases I could find that address the fact that someone was banned from speaking in front of the city council based upon their prior behavior. And as a matter of fact, there's a Sixth Circuit case, Polaris, that says you can't prohibit somebody's First Amendment rights based upon their prior behavior. So I see my time is up. Well, hang on. I'm sorry. I'm not going to let you off the hook. That's fine. I've just got sort of more I need to explore. Please. And so like Judge Pryor said, if we hold you on, you're not eating into your rebuttal. Okay. So one more question on the First Amendment piece. Even if we're in content neutral land, and you've been talking a lot about narrow tailoring. Yeah. What exactly is the important or substantial government interest here? I mean, was it infringed? I mean, I get it that they have an interest in ensuring that the meetings are not disrupted. Right. But I mean, I don't know. The meeting went on. Like, I've watched the video. No. Your guy is being escorted out. The next guy just steps up and starts talking. Right. I didn't even get into that. But you're absolutely right. I totally agree with you. I mean, their interest, I believe, was in making sure that their meetings proceed and they didn't want disruption. But as Your Honor said, Judge Newsom, the meeting did go on. I think, as a matter of fact, the next speaker didn't even hesitate to speak. I think a couple of people in the back turned around. So, you know, I understand what their interest was. But in this case, unlike some of the other cases that I cited, those people were disruptive as they were speaking. They were told to stop or something like that. This occurred outside the council chambers. And I don't think that banishment served the governmental purpose, as the court points out. The meeting went on. So can I ask you a question about the disorderly conduct arrest? Sure. I'll just be coarse. It's about the crotch grab, the alleged crotch grab. Yes. Two questions, I guess. One, sort of factually, I've watched the video. I can't see it. I don't see a crotch grab. But hasn't your guy acknowledged that the officer might reasonably have thought he witnessed a crotch grab? And under the sort of the probable cause analysis, isn't that what his reasonable belief is what we're concerned about, not about sort of what actually happened? Let me answer it two ways. One, I happen to agree with the court. I didn't see it. And if the court looks at the video, the court needs to ask itself, is it possible that Sergeant Wright could have seen a crotch grab? And the answer is no. In fairness to my client, I don't think he was right. I think he was trying to be overly fair at his deposition. And by the way, the word he used was possible. But if the courts, the judges, you take a look at the video, he just keeps walking. There is no crotch grab. And even if he touched, as he's walking, touched his genital area fully clothed, that still is not disorderly conduct. So that's my next question, is as a matter of law, what's the difference between the middle finger and a crotch grab? Why is the middle finger not disorderly conduct, but suddenly the crotch grab is? I don't think I understand. Maybe I don't understand well enough. I'm not saying it is. Gestures communicate. Well, no, I'm asking, is there a legal distinction between what those two things communicate? No. Not under this circumstance. If my client had done more than give the finger, and even assuming he grabbed his crotch, had done more to incite other people, then I would say yes. But in this case, if you just, and I don't mean to belabor this, but if you grab your crotch and leave, you haven't done anything wrong. Maybe people don't want to behave that way, but that's not against the law. And that's basically what they're saying. It's more than words, he grabbed his crotch. But if you look at the video, it's clear he did not. And my client, I believe, was being overly generous when he answered that question. I tend to agree with you that I don't see a difference. But what about the standard that we're looking at? Is it possible that the officer could have, let's assume that there was a crotch grab, which I know you're not, but is it possible the officer could have thought that there was some special thing about a crotch grab that gave him probable cause? No. No. No. First of all, possible crotch grab. But second, even if he did it, even if he did it, that's not disorderly conduct. Can I ask you a question about that? Because you mentioned the word incitement a minute ago. I've read the underlying Florida cases on this disorderly conduct, and they all do seem to say that absent some actual incitement of people, it's not disorderly conduct. Yes. But I'll have to confess. That just seems a little weird to me that a police officer should have to await the actual breach of the peace before there's disorderly conduct instead of anticipate like, oh boy, this is escalating. This could reasonably result in an incitement. I need to nip this now. And that would be fine if he nipped it. It would be. I have no problem with him nipping it. I have a problem with him arresting it to nip him. You could say, Dr. McDonough, please, you're about to do something. Please leave. All right. We can live with that. I see. But his nipping was arresting him for the crime of disorderly conduct. There has to be actual incitement. There has to be actual incitement. And then the district court judge added the fact that they had had an interaction 28 days before, and he thought something was going to happen when the clear facts of the case indicate that nothing was happening. He walked away. He wasn't giving anybody any problems. He followed every order of Sergeant Wright, every order, and left the scene. And there was nobody there to incite. So, I see my time is up. Thank you. I've reserved some time for rebuttal. Thanks.  You'll have your time for rebuttal. You are answering the court's questions. Mr. Geddes. Good morning. May it please the court. Edward Geddes on behalf of the Appalese, Officers Garcia, Wright, and the City of Homestead with me at counsel table are Matthew Mandel and Ann Flanagan who were counsel of record in the district court. Unless the court prefers to take it in a different order, I'd like to start with the First Amendment issue. My friend on the other side seems to acknowledge that we're not dealing with a content-based scenario here. So, what's your position on that? Because, I mean, I'll confess, it was language in your brief characterizing the decision-making process that sort of tipped me off to this potential problem. So, what do you mean when you say the decision was based on these three things, two of which seem to me to go to the content of the speech? It's a fair observation, Judge Newsom. When I went back and reread the brief, I thought, we really didn't need to say that because what we were trying to point out, we were merely describing what happened at the prior counsel meeting and we were just being factually correct. In fact, it was never intended that the trespass was issued because of what was said either to Councilman Maldonado or as he was leaving the council chambers or even after he left the council chambers and was still in City Hall. So, I can understand why the way we phrased it might have created that perception, but we were merely describing the behavior that happened at that meeting. And that's what we come back to, this notion that the trespass order was based upon behavior and not so much what was said. And I would draw attention to the fact that... Do you think, and I haven't looked to see if cases have decided this, so maybe the answer is obvious, but I'm not confident that cursing is content anyway because, for instance, there are a lot of words for human excrement, some of which are cursing and some of which you teach your two-year-old. So, is that really about content or more about behavior? It's more about behavior. There's no question. And it's context that matters. We're in the middle of a city council meeting. So, just so I'm clear, does that mean that if you can say hypothetically, if you say to one of our councilmen, go fly a kite, it's fine. But if you say go F yourself, we're going to take you out. That's not content-based? If that were the distinction that was drawn in this case, I would say there's a problem there. But that's not what happened here. I just think that in a certain context, if after Mr. McDonough, Dr. McDonough was asked to leave the podium, and as he's being escorted out, he's cursing up a storm. He's no longer speaking to the council. This is just, I don't want to use the terminology, but it's a series of expletives. And Your Honor said you watched the video. You see the reactions of some of the people wondering, like, you know, what's that? I thought they were quite muted. I was surprised by how muted the reactions were. It seemed to me like the meeting just kind of went on. People were like, oh, that, maybe they even thought. They're probably accustomed to it, right? Yeah, and that's a sad commentary of where we are in public discourse, perhaps. But that's neither here nor there. I think it's interesting, and it bears maybe some discussion. My friend on the other side said, well, there's no case law addressing this. And respectfully, I think there is. And it's this court's decision, an unpublished decision, as it were. But the decision in 2021, just a few months before Net Choice and Austin, in Dyer, and the Atlanta school district, the facts are remarkably similar. To be fair, though, unpublished cases are not case law. I understand. And that's why I wanted to disclose to the court that. So what was it that you found persuasive about the analysis in that case, rather than just similar to this case? Well, what was persuasive about the case was that in a scenario where a participant at a school board meeting, a community meeting, which is open to the public, somebody was very disruptive. And the end result of that was that the school district issued a trespass order, the effective equivalent of a trespass order. It was issued by the police department. It was the school saying, you shall not, not only not appear at a community meeting of the school district, you shall not go anywhere on school board property, any district property. You are not out for one year. Based upon your behavior at that community meeting. Right. So that's what happened. Right. But what's persuasive to you about why that was allowed to happen? Because the court concluded that ultimately that kind of a restriction was a content neutral one that justified the district's interest in the orderly conduct of public meetings. And that's what we have here. And so, but to follow up on Judge Grant's point, I mean like so one level deeper, and I don't even remember the case if I've read it, so you'll have to help me, but like what's the analysis? The court said that justified the school district's interest. Why? Like what was the compelling governmental interest or whatever, the substantial government interest? What was the narrow tailoring? I think we're just trying to figure out because it's unpublished, like is it the sort of thing that is worthy of our attention? It can't just be the result, I guess. I understand. I understand, Your Honor, and I apologize. I'm going to find the. The district court granted AIS the district's motion for summary judgment on both remaining constitutional claims. For the First Amendment claim, the district court found that the district's restrictions on Dyer were content neutral, and as the district cut off Dyer's speech because he expressed himself in a hostile manner that disrupted the meeting progress. That's the court's description. And then the court in its analysis says, apologize, A content neutral ordinance is one that places no restrictions on either particular viewpoint or any subject matter that may be discussed here. The district board policies outlining how someone may speak at a community meeting, prohibiting disruption and requiring decorum are content neutral policies. We agree with the district court's determination that the district did not regulate Dyer speech based on its content because it was offensive. Rather, they regulated Dyer's offensive speech because it was disruptive. That's where they. Well, I couldn't. Why, why wouldn't the appropriate thing to do be? And I've, I've not familiar with that case either, but why wouldn't the appropriate thing to be, be, if a speaker is disruptive, then they're removed rather than telling a speaker who has been disruptive in the past that they may never speak again. Those are, those are different, right? Certainly, but then the question became, and this was part of the process that the city went through. They tried to determine, well, is there, is there a trespass order that can issue subsequent to the actual event? And they inquired of the assistant state attorneys, the state attorney's office, they got to go ahead. Yes, you can do it after the fact. And the discussion, even among command staff was, well, You know, we had this prior disruption. We want to avoid it from occurring again. And I think part of what. I get wanting to avoid it. I'm just, I'm less certain that you can. Under the first amendment, I'm less certain that you don't have, that you don't need to wait for him to become disruptive again and then escort him out again. Time after time after time. And I too would be very frustrated if I were on the city council and this kept happening. I don't think it's a very good way to behave, but I'm not confident that you can just say you can't come to this public meeting again because you've been disruptive at past public meetings. Well, I mean, I'm what we went by the, the available case law that, and I understand it's an unpublished decision, but we keep coming back to what, how the, how this very court, just a few months earlier reasoned that it was appropriate to take that step precisely because in that case, the district couldn't know when the next flare up would be. Did the, did the, did that, the court in that case, um, consider less restrictive alternatives, um, the repeated removals as judge grant refers to, or the teleconferencing option that your adversary refers to? I mean, it does seem like there are, there are off ramps between nothing and a bar. Well, I mean, this wasn't an, okay. And I know there's disagreement with my friend on the other side, but there's, this, this is an absolute bar, right? This is, you cannot come back to, and actually it was, you cannot come back to city hall because part of the conduct was not just in council chambers during the council meeting. It was also what occurred outside of council chambers, still within city hall, which is the constant escalation, the, the, the antagonism that was happening. And the decision was, you can't come back unless you write to the city and get permission to do so. The idea being it's, it's a cooling off period. Can I ask you a quick question? Can you give me the site for that case? Certainly, Your Honor. It is, I apologize. The glasses are great for looking, but not for a reading up close. We're all there. Yeah. 852 Federal Appendix 397. Thanks. Sure. Can I ask, while you're at a pause, can I, can I ask you sort of like a macro macro macro question? To what extent taking a few steps back, should we be, should I be concerned? I'll speak for myself. Should I be concerned that this seems to me like the absolute core of what the first amendment is about? Political speech, sort of petitioning in some modern sense, the government for a redress of grievances. Isn't this like absolutely what the first amendment's like essence is participatory democracy. I realized this was course, it's not my bag. It's not how I talk. But that being said, this is participatory democracy and it's messy. At a macro macro macro macro level, as Your Honor pointed out, I agree. The issue of political discourse, the coming to a city council meeting and expressing your views on the subject is certainly at the core, but the fact that it's at the core doesn't mean that there cannot be rules of it means that we should be wary, doesn't it? I mean, this isn't, you know, this isn't new dancing, right? This is, I understand. I, and I understand and I'm not suggesting to the court in any way that it should just shrug its shoulders and say, so what, uh, what's the big deal. I understand that the trespass order related to going to city hall, but given the undisputed facts that we have here regarding the behavior that happened, the, we're, we're past the point that what is being regulated is not the political speech or an attempt to regulate the political speech, but to prevent certain types of behavior. So let's put it this way. If, if instead of the appellant having left the stand and started screaming, uh, Mary had a little lamb, her fleece was white as snow and started in some crazed recitation of nursery rhymes. The disruption would have occurred either way. And in fact, it's interestingly enough, the Florida Supreme court in the white case when looking at what constitutes disorderly conduct in that case drew that exact same example, which, which involved an individual who shows up at a police station, insisting upon the release of his father, who's in custody and loses it. And the court says it's not about what the individual was saying, what he was saying, it's how it was being said and in the context of how it was being said, which in that case, and that's when the court said, if they had, if you'd been screaming, Mary had a little lamb at the top of his lungs, the issue would have been the same. So, I mean, that, that arguably gets you to content neutral. Um, but you've still got to wrangle with the standard that applies. If we're applying some version of intermediate scrutiny. Right. And so now we're back to judge Grant's question and my question and your adversary's position about successive takeouts or teleconferencing or whatever, like, you know, um, options short of a presumptive. Well, in part, and this is, I'm not aware of any case law. All right. And again, in this circuit or at the Supreme court level that has indicated that in a, in a situation where you have disruptive behavior in a government conducted proceeding that you're required to consider as a less narrow or a less stringent matter. You have to let it happen again because there's something fundamentally wrong with the notion that the, and this sort of gets to the question of what would be narrower? Well, one possible solution is, okay, we're going to let you come back in and we'll cross our fingers. Maybe it doesn't happen again. Um, and I just don't see, I'm not aware of any case law that says that you have to do that when you have the behavior and it's documented and you're worried about it happening at the Supreme court level. So I don't know if you've ever had this sort of thing happen before. The record doesn't reflect that it had. Are you aware? I personally, no, I am not. So I can't speak to it. I don't want. So anyway, so far as we know, this is the first time this has happened. Um, and I don't know, it doesn't seem that big an ask to me. If, if as we take the case, this is the first time this has happened, that some sort of like admonition, Hey, that was ugly last time. Don't do that again. No more cursing, no more talking to individual commissioners. Um, be, you know, mind your Ps and Qs. Um, and then if he, if he violates that one, take him out again, maybe the next time it's a teleconference, you mute him. If he keeps doing it, then you ban him or some version of that. But here you kind of just went like straight to the nuclear option. The only, yeah, I can't dispute those, those facts. I would point out that I'm not aware in the record where that was the contention made below, um, that there were these other options available to the city. Um, it was just this notion. Well, you've, you've, you've, you've banned him. And the problem with the ban is that you haven't told him how to, how to avoid it, how to, how to get out of it, uh, which is really a procedural due process claim, which also was not asserted below. So I, would it be possible? Yes. I, I be lying to the court. If I didn't say it was possibility, but under this record and under the available case law, I'm not aware that there is that requirement. I'm sorry, Judge Grant, it seemed like you were about to ask a question. Well, I'm just shifting gears a little bit, um, to go to the disorderly conduct issue. Do you think that crotch grabbing is different than giving the bird? I think actually, I never thought I'd find myself in the United States court of appeals, arguing the distinctions between giving the bird and crotch grabbing. But I do think there's a difference, um, at least certainly from the perspective of the officer who was on the scene when somebody, this seems odd. When somebody flips a bird, it's, it's a, it's directed at someone, right? If, if I were to do that to the court, heaven forbid, um, you would certainly take it as a statement that I was making to you. A crotch grab has other implications. Again, I'm not, I can't cite to an authority on the, on, on crotch grabbing, but keep in mind that what happened here, at least from the perspective of the officers is that there were other people in city hall coming in and out of city hall who might've observed, not so much the flipping of the bird to Sergeant Wright, but grabbing the crotch. What does that make it incitement? And if so incitement of what, like a massive crotch grabbing, I don't really know what would be incited. It's, it's not a question of, of incitement. And, and again, I, I'm not convinced that the case law is clear under Florida state law, that incitement is always required because I come back to the white decision from the Florida Supreme Court, which was the individual who went to the police station to get his father released. And just because he was emotionally upset, lost it and started behaving really, really irrationally and yelling. And the court concluded that was disorderly conduct, even though there wasn't an incitement to riot or an incitement to, to physical danger. It was just precisely how the behavior was occurring in the context of a police station. So, so what I, so we've talked about the sort of the any potential legal distinction between finger shooting or bird shooting and crotch grabbing, right? Sort of the, what those two things express or don't express. What about the factual piece of this? I mean, like I've watched the video. Can you find the crotch grab in that video on under from any angle? I mean, you've probably watched it a thousand times. I've watched it five times, but I just can't find it. I can't figure out when it would have happened. The officer's testimony is that he grabbed his crotch as he was shooting the bird. And as you can see, when he emerges from the pillar, he then goes to shoot the bird that lasts for like three or four seconds. And he's definitely not grabbing his crotch. Then no doubt about it. All I can point out too, is that I can't put myself in Sergeant Wright's position, which is where we all need to put ourselves in the position of a reasonable officer in the moment with the knowledge that he has in the context that it occurs. And I can't say definitively that Sergeant Wright might not have perceived it. And in fact, and I know my friend on the other side says that, that, that the appellant was being generous. I don't know. I don't know where the generosity comes from. If you look at that in the same way as if an officer said, I saw someone brandish a knife and it turned out to be a cell phone. Are you, is that the same sort of thing? Like maybe, maybe the officer thought that there was a crotch grab, even if there wasn't one or are you making a different kind of argument? Well, no, I mean, there is that, that question of perception from the arresting or the arresting officers viewpoint, which is to use your example, is it utterly unreasonable for a police officer to think that a cell phone might be a knife or that it might be some kind of a weapon? No, I, and then I guess, I guess if the, if you see a cell phone, then you might think, Oh, well, maybe the officer thought that was a knife, but what if you see nothing on the video and the officer says, I thought I saw him brandish a knife. Is that different? Well, that hindsight is 2020, right? We, we collectively have the luxury of calmly watching a video and making a determination. Well, is that reasonable to have concluded that based upon what was seen? But at the moment when the appellant had been just given his trespass order and he turns around and begins behaving in a manner that was reminiscent of what Sergeant Wright observed at the council meeting, the yelling, the screaming, the threatening, the, the, the foul language. And then he, and then he according to Sergeant Wright perceives that there was a, a crotch grab in the presence of other people in city hall.  After the fact, if you view the video, that wasn't, that probably wasn't the right call, but Sergeant Wright didn't have the benefit of the video. He was, he was in the moment having just ordered somebody to leave. And as that person is leaving, he's seeing a repetition of the behavior of which he knows. And again, under the, under this court's precedent, when looking at that analysis, you do consider the knowledge the officer had at the time of making the arrest. So I can't recall, was there a crotch grab at the meeting? No, there wasn't a crotch grab. Uh, I'm not aware of any prior instances of crotch grabbing. I did that. I am. Well, hold on. I'm sorry. He's like, please let me sit. No, no, no, no, no. I'm just worried. I'm, I'm, I see the blinking red light and I'm at seven and a half minutes, but as long as the court has questions, I want to ask you one question about the cyber stalking arrest. We haven't really touched on that yet. Um, so as, as I read the district court's opinion, it says that the cyber stalking arrest, the probable cause to arrest on that was based on three things. One, him calling, or, you know, this, maybe this is from your brief sort of echoing the district court. One, him calling, uh, Mal, Malden, uh, Monica Monaco, a coward, right? Two, that he thought he had been threatened with retaliation or that he threatened retaliate. I'm sorry that, that, that, uh, McDonough threatened retaliation and three that he threatened to blast the address out. Correct. His home address. Take those one by one. So what, so surely calling someone a coward is not disorderly conduct or, or sorry, sorry, cyber cyber stuff. That's my question. Yeah, no, I, I, so just kind of factor that out. Right. I would not say second piece of it that he, that McDonough threatened retaliation. I thought McDonough said that he thought he had been threatened with retaliation. My focus on, on the question of the cyber stalking, because all the statute requires is that there be a, this, this fear that arises from the conduct that occurs. And in this focused on the blast. Absolutely. It is, it is, it is revealing or threatening to reveal to the public, a police officer's home address. So, so here's my question. How is that revelatory if the police officer himself has already gone public with his own address? Like he's, there's, I don't know, there's a, there's a video online of him saying into the mic leaning in and saying, here's my home address. Right. But respectfully, your honor, he might've disclosed his home address to the state of Florida to get a driver's license. There are any number of different, I mean, would that be publicly publicly available for all to see? I don't know. But the point is that what he would, what the appellant was threatening was not just because he does it twice, right. Which is once he includes a link in the very first post to a YouTube video and that YouTube video is where officer Monaco appeared at the public meeting. Right. And then at the end, he then subsequently says, I'm going to blast that information. It's, it's probably a safe assumption for us to say that the vast majority of people, and again, I'm speculating here do not spend 24 hours a day searching YouTube videos to find home addresses for police officers. But the appellant was going to make it a point to disclose it, to send it out. And I think it's almost self-evident why a police officer would be worried for himself and for his family, that his home address was going to be blasted to somebody who is antagonistic to him. Actually, I take your point on that. I mean, I, you know, I wouldn't want my, my home address is out there. I wouldn't want to blast it out. But what about the, what about whether this was repeated? Didn't this happen? Didn't this interaction happen in a really short timeframe? And I think cyber stalking generally requires, if I think of stalking, I think of that as taking a, you know, a period of time. If you do one bad thing to someone that's not stalking, but if you kind of show up at their house once a week or creepily follow them around a lot, right, that is stalking and that gets at the repeated part of the test. But how has this repeated? I'm going to read what the statute actually says. It defines the term course of, this is 784.0481B. It says course of conduct means a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose. Okay. Was this a series of acts over a period of time? Our contention is that the, the, the posts, which terminated, culminated in the, I'm going to blast your email or your email, sorry. Your home address was the last of a number of posts that occurred in however short a period of time that, and I'm going to, I'm going to use the language. You're a giant twat, you know, you're a coward, you're a liar. There were a series of personalized insults that then culminate in I'm going to reveal your home address to the public. These timing issues are really hard. I mean, the Supreme Court has looked at this in a different context over, you know, how do you determine whether it's a series of criminal events or one kind of course of conduct that's one criminal event. And I, I think one, speaking only for myself, I have a hard time necessarily. I think it's close as to whether this was all one incident that took place over a period of hours or whether it was a series of incidents that took place. All I can, I understand, but I, I don't think this has to be measured in any context other than the statutory context under Florida law. Right. And in this instance, the Florida legislature gave us a definition and it, it took pains. I, I mean, it's, it's interesting that the court, the legislature could have said course of conduct means a pattern of conduct composed of a series of acts over a period of time, which evidence is a constant, a continuity of purpose, but they didn't. They added, however short. What's your, what's your closest Florida case to these facts? There isn't one, Your Honor. I wish I, I, that wasn't a trick question. I just wanted to make sure. No, I understand. And, and, and this is not a statute that has an abundance of, of case law associated with it. It's the, the one case I am aware of, which is the, the Crapex decision from the fourth district court of appeal seems to say, well, we're going to treat four hours worth of, of taggings as a single instance. Right. So I can see that that is out there, but I think the difference between Crapex and here is in the facts of Crapex, the tagging was, was a reversible event. In other words, if I get tagged, I go on Facebook and I can untag myself and, and the episodes done these postings by the appellant are permanent. There's no one, there's no evidence in the record anywhere along the way that the appellant intended to take them down, that they weren't going to be available to every single person who visited leo affairs.com. And every time somebody would go on leo affairs.com, they would see this over and over and over again. And which we contend is the continuity of purpose because the appellant knew that he controlled these posts entirely and that they would stay there as long as he wanted them to stay there. So this isn't quite in our view, Crapex. And I would also add with due respect to the fourth DCA, I don't think the fourth DCA is conclusion about the four hours being a single instance is grounded in the statutory language because the statutory language does in fact say, however short. So the court has been very generous with its time and I appreciate that. Unless the court has any other questions, we would respectfully request that the court affirm. Thank you. Mr. Greenstein, you'll have your full time that you reserve for rebuttal. He's sitting in the audience. Judge, let me first address the disorderly conduct. Everyone's viewed the video. It's quite obvious that my client did not grab his crotch. And if we're going to discuss this, let's just make this clear. It's our position. And I put this in my brief that Sergeant Wright was not being exactly truthful. I think he was embellishing to make sure the disorderly conduct arrest could stand. That's why he put in is in his report about the fact that there were four women and children. There were people coming in and out. If the court looks at the video, one person is coming in, two women are going out and they're not even looking at what's going on. So there's no evidence that he grabbed his crotch. And I cited a case. And honestly, I don't remember the name of the case. The court doesn't have to believe the officer just because he says it. You can use your own eyes and ears as to what happened. Different, different case. Let's say that in a different meeting, a different client was angry that they had been thrown out and repeatedly grabbed his crotch and made other vile motions at the officer. And kind of, it was not kind of a, you know, see you later situation. It was more of a harassment. Would that qualify as disorderly conduct? No, no. Why not? That's just lewd behavior. We don't want people behaving like that because judge part of disorderly conduct requires an incitement to get other people to do things. Now, if for example, he grabbed his crotch constantly and there were people gathering and then he said to all these people, look at these effing police officers. We got to do something about that. You know, maybe then, but disorderly conduct is what we want to make sure. And what Saunders basically said, Saunders versus state is we don't want to punish people for the words they use. That's the first amendment. Now grabbing your crotch isn't the first amendment, but maybe it describes a first, just like giving the bird. It describes words. And let me say this. The court, courts don't need to assume that something's going to happen in the future. In this case, all we have is one incident where even if he did grab his crotch, nothing happened. And I think the court can limit its decision, its opinion to that one fact. We don't have to go beyond, well, we have to worry about what if he does it all the time, we don't have to worry about that. The same thing with the first amendment. In this case, this is the first, no other incidents ever happened as far as the record is concerned, nor do I know of any. So now on one time, as judge Newsom said, they took the nuclear option. The court doesn't need to go beyond that and say, well, what happens if someone is disruptive all the time? Let me address. One question. Sure. Maybe it's housekeeping. We haven't talked about it yet today, but it is a position that you have raised in your brief Garcia. Yes, really? Yes. I have a hard time with Garcia. I can understand that, but the court needs to understand. And the reason that he is responsible for the arrest, the physical detainment. And I hope I made that clear in my brief is just one step of an arrest. As I said in my brief, because it's a misdemeanor, they didn't have to take him to jail. They did not have to do that. They could give him a promise to appear, which does happen. And then he's like, go said, we'll see in court. That's fine. But the physical detainment, what Sergeant Garcia then did is write the arrest form. And that's the thing that keeps him in jail. If the court, I don't know how familiar are with what goes on here in Miami Dade County. We have one example with Judge Glaser is you come in front of a bond hearing. The judge reads the affidavit is sworn to if there's no probable cause you're released. If there is probable cause, you can be held on some sort of bond or recognizance, whatever it is. So it's more than than just simply being detained. OK, I'm stopped. I'm detained. But Garcia is the one that made it so that he could would stay in jail pending being taken before a magistrate. And that's what happened. So that's why it's important. It's I couldn't find a case on that directly. But the court needs to think of the fact that this is more than just physical detainment. Stop. You're under arrest. Now, the arrest forms the key thing that keeps him in custody. Without that, he has to be released. There's nothing. Had he already been taken to the jail before Garcia got involved? No. No, the jail won't take him without the arrest form. I mean, that's not part of the record. I'm just telling you, I've been practicing outside. Physically detained outside. Garcia is not on the scene yet. But Garcia comes out. He's the junior officer and he writes up the arrest. Well, yes. I don't know if junior is the correct word. He's certainly not. He's not the supervisor on the scene. But anyway, yes, he gets tasked with writing the. Yes. And your contention is the report is what lands your client in jail. That's what lands him in jail. Well, not only lands him in jail, that keeps him in jail. Keeps him in jail. And as a matter of fact, he went to jail. You're allowed to bond out. They have standard bonds and he bonded out. He did not end up in front of a in front of a magistrate on that particular incident. He did on the cyber stalking. But that's the thing that would make you come in front of a magistrate. And the jail will not take you without that arrest form. They're just not going to take you. Let me address something. I see my time's up, so I don't want to go on unless the court has any questions. I wanted to address the cyber stalking. I don't know if the court. I think we've got your. All right. Great. Thank you very much. I appreciate the opportunity.